**Karkhanejat Towlidi TEHRAN, Plaintiff,**

v.

**S. S. PHILIPPINE PRESIDENT GARCIA, (now known as the GALLEON JADE) her engines, boilers, etc., United Philippine Lines, John Doe Company, d/b/a Gulf Ocean Lines, Gulf Ocean Lines and Mercantile & Marine Inc., Defendants.**

No. 78 Civ. 2885.

United States District Court,
S. D. New York.

Oct. 12, 1979.

---

Donovan, Maloof, Walsh & Kennedy, New York City, for plaintiff; Donald M. Kennedy, Francis J. McCaffrey, New York City, of counsel.

Kirlin, Campbell & Keating, New York City, for defendant United Philippine Lines; Richard H. Sommer, Armand Maurice Pare, Jr., New York City, of counsel.

Poles, Tublin, Patestides & Stratakis, New York City, for defendants John Doe Co., Gulf Ocean Lines and Mercantile & Marine Inc.

LASKER, District Judge.

Karkhanejat Towlidi Tehran sues to recover for cargo loss or damage allegedly suffered during a voyage between Port Allen, Louisiana, and Khorramshahr, Iran. Defendant United Philippine Lines ("UPL") moves to dismiss the complaint against it on the grounds that the court lacks personal jurisdiction. Tehran argues that jurisdiction over UPL exists by virtue of New York's long arm statute, N.Y.Civ.Prac.Law § 302, because UPL transacted business in New York in connection with the issuance of the bill of lading covering the damaged cargo, and Tehran's cause of action arises from that transaction.[1]

---

1. Counsel for the other defendants in this action have taken no position on this motion.

Tehran purchased 1000 metric tons of polyethelene from a firm in New York City. The polyethelene was carried from Port Allen to Khorramshahr aboard the S.S. Philippine President Garcia. The Philippine President Garcia is owned by UPL, which chartered it to Unimarine, S.A. Unimarine, in turn, sub-chartered the ship to Intergulf, S.A., which does business as Gulf Ocean Lines ("GOL"). The contract for the shipment of the polyethelene between the seller and GOL was negotiated and executed in New York. Tehran's cause of action arises from this contract. He does not contend, however, that jurisdiction over UPL exits because UPL had something to do with the formation of the contract, but rather because of UPL's role in the issuance of the bill of lading covering the shipment, which incorporated the contract.

The charter party between UPL and Unimarine and the sub-charter between Unimarine and GOL provided, in identical language, that

"[i]f required by Charterers and/or their Agents, Master to authorize Charterers or their Agents to sign Bills of Lading on his behalf in accordance with Mate's and/or Tally Clerk's receipt." [2]

Pursuant to this provision, the master of the Philippine President Garcia, as UPL's agent,[3] authorized the Dalton Steamship Company, GOL's agent in Port Allen,

"to sign on my behalf all Bills of Lading covering cargo laden on-board my vessel at the Port of Baton Rouge, Louisiana as per mates [sic] receipts." [4]

When Dalton received receipts indicating that the polyethelene purchased by Tehran had been loaded, it directed GOL's New York agent, Mercantile & Marine Inc. ("M&M"), to issue the bill of lading "for the master." The bill was issued in New York and forwarded to Tehran, who presented it to the master when the vessel arrived in Iran to secure delivery of the polyethelene.

Tehran asserts that jurisdiction over UPL lies under section 302(a)(1) of the C.P.L.R., which provides that

"[a]s to any cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nondomiciliary . . . who in person or through an agent: 1. transacts any business within the state . . . ."

N.Y.Civ.Prac.Law § 302(a)(1). Two questions must be considered: first, whether, in the course of events relating to the issuance of the bill of lading, UPL transacted business in New York "in person or through an agent," and second, if so, whether Tehran's cause of action "arises from" that transaction.

The bill of lading covering the shipment involved here was issued by M&M in New York. This constitutes a transaction of business *by UPL* only if M&M acted as UPL's agent within the meaning of section 302(a). The question is not one of the law of agency—the answer does not depend on whether or not M&M's signature on the bill of lading made UPL a party to the shipping contract, subject to the obligations and entitled to the immunities contained in it. Nor is the issue the effect of the signing of the bill on the legal relationship between the parties. It is rather whether in signing the bill for UPL, M&M acted in New York at the request of and for the business purposes of UPL, so that UPL may be said to have engaged in "purposeful activities" in New York through M&M. *Galgay v. Bulletin Company, Inc.*, 504 F.2d 1062, 1065 (2d Cir. 1974).

---

2. Affidavit in Opposition, Exhibit 3, cl. 41 (sub-charter); *id.*, Exhibit 4, cl. 42 (head charter).

3. Clause 8 of both the head charter and the sub-charter provides that

"[t]he Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency . . . ."

Affidavit in Opposition, Exhibit 3, cl. 8; *id.*, Exhibit 4, cl. 8. The parties have not raised, and it is unnecessary to consider, in view of our decision that jurisdiction does not exist over UPL even if the master is deemed to have acted as its agent, whether this provision might "isolate the owner from *in personam* liability to the cargo interest." G. Gilmore & C. Black, The Law of Admiralty § 4–17 at 233 (2d ed. 1975).

4. Affidavit in Opposition, Exhibit 1.

The issuance of the bill of lading may have furthered UPL's business purpose, but the fact that M&M, rather than some other entity, signed the bill on UPL's behalf, was of no consequence to UPL. UPL did not ask M&M to act in New York for it—the bill was issued in New York solely for the convenience of GOL and its client, the shipper. So far as UPL was concerned, the fact that the bill was issued in New York, rather than Louisiana, or anywhere else, was purely fortuitous. Thus, whatever the quality of M&M's actions in New York may have been, they did not amount to "*purposeful* activity" in New York on the part of UPL—UPL'S active involvement in the chain that links it to New York ended in Port Allen, where the master authorized Dalton to act on his behalf.

Moreover, even if the issuance of the bill of lading in New York were imputed to UPL for these purposes, that chain would be too slender to support jurisdiction, since Tehran's cause of action did not arise out of that act. Tehran's suit is based on the underlying contract of carriage, of which the bill of lading is a part, but it arises from the terms of the contract, and not from the simple fact that UPL became a party to that contract through a ministerial act performed in New York. *Id.* Thus, even if the execution of the contract in New York on behalf of UPL were a transaction of business here by UPL, the court would lack jurisdiction over UPL, because the execution itself is not so significant an element of the contract that the cause of action can be said to "arise from" it.

In short, the nexus between UPL's activities in connection with the shipment of the polyethelene purchased by Tehran and New York did not constitute a transaction of business in New York by UPL, nor did it give rise to Tehran's cause of action. Accordingly, New York's long arm statute provides no basis for the assertion of jurisdiction over UPL.

These considerations are sufficient to dispose of the matter. However, it is worth adding that any assertion of jurisdiction over UPL in the circumstances of this case would appear to be inconsistent with due process standards. In *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), the Supreme Court held that due process requires

> "that in order to subject a defendant to a judgment *in personam*, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"

*Id.* at 316, 66 S.Ct. at 158 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)). In describing the type of contacts which satisfy this standard, the Court concluded:

> "[T]o the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations, and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue."

*Id.* at 319. 66 S.Ct. at 160. In *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), the Court noted, in the same vein, that

> "it is essential in each case that there be some act by which the defendant *purposefully* avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."

*Id.* at 253, 78 S.Ct. at 1240 (emphasis added). Nothing that UPL did in connection with the shipment of polyethelene involved here amounted to an act by which it "purposefully avail[ed] itself of the privilege of conducting activities within" New York. As noted earlier, so far as UPL was concerned it was purely fortuitous that the bill of lading was issued on its behalf in New York. This is not the quality of contact with a forum that will, consistent with the

due process clause, support jurisdiction over an absent defendant.

For the reasons stated, the court lacks personal jurisdiction over UPL. In his brief in opposition to UPL's motion, Tehran requests that if the court determines that jurisdiction does not exist here, it transfer the case to the United States District Court for the Eastern District of Louisiana rather than dismiss the complaint against UPL. However, Tehran has not formally moved to transfer, and accordingly, the legal and factual questions raised by Tehran's request, and in particular those relating to the court's power to order such a transfer and the nature of the showing that must be made to justify one, have not been adequately addressed by the parties. To accord Tehran an opportunity to move to transfer, UPL's motion to dismiss the complaint will be denied for the moment. If Tehran does not move to transfer the case to Louisiana within fifteen days of the filing of this memorandum, UPL is directed to submit, on notice, a proposed order dismissing the complaint.

Subject only to the conditions noted above, the motion is denied.

It is so ordered.

